UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JAMES B. JOHNSON,                                                                      Plaintiff,

v.                                                          Civil Action No. 3:15-cv-715-DJH-CHL

UNITED STATES OF AMERICA,                                    Defendant.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

In March 2012, Plaintiff James Johnson underwent surgery at the Veterans Affairs Medical Center in Louisville, Kentucky, to remove a suspected cancerous mass in his gastrointestinal area. (Docket No. 41-8, PageID # 614–15) After the surgery, a pathology report indicated that the mass was not in fact cancerous. (D.N. 38-1, PageID # 101) As a result, Johnson brings this action under the Federal Tort Claims Act, alleging that the Veterans Affairs Medical Center was negligent in proceeding to surgery without first confirming that the mass was cancerous. (*See* D.N. 1) The United States now moves for summary judgment. (D.N. 38) For the reasons set forth below, the Court will grant the motion in part. Summary judgment is warranted as to all claims except the allegation concerning Johnson's drainage tube.

### I.     Background

The following facts are undisputed, except where otherwise noted. On November 23, 2011, Johnson was admitted to the emergency room at the Veterans Affairs Medical Center (VAMC), complaining of dark stools that he had experienced the previous two weeks. (D.N. 38-2, PageID # 113–114) Upon his admission, Johnson also reported that he had experienced abdominal pain for the prior four months. (*Id.*) Doctors conducted an esophagogastroduodenoscopy (EGD) on Johnson, which revealed a small duodenal ulcer and a

1

"mass in [his] antrum" that was described as a "possible pancreatic rest." (*Id*., PageID # 114) In light of the mass, doctors recommended a follow-up biopsy and an endoscopic ultrasound (EUS).[1] (D.N. 41-1, PageID # 396)

Thereafter, the VAMC referred Johnson's case to Dr. Stephen McClave at the University of Louisville. (D.N. 38-4, PageID # 163) In January 2012, Dr. McClave performed an EUS on Johnson to determine whether the mass was a cancerous gastrointestinal stromal tumor (GIST). (*Id*., PageID # 165–66) According to Dr. McClave's testimony, although an EUS is a common procedure, it does not always provide a definitive assessment of the mass in question. (*Id*., PageID # 167) When an EUS's results are inconclusive, doctors often follow up with a fine-needle aspiration (FNA), which amounts to placing a needle in the middle of the mass to biopsy cells. (*Id*., PageID # 169) Dr. McClave testified that while FNAs are an accurate diagnostic tool, they are especially difficult to perform on GISTs. (*Id*., PageID # 172–74)

In Johnson's case, the EUS produced an image that was consistent with a GIST. (*Id*., PageID # 179) Dr. McClave therefore performed an FNA to rule out the mass as cancerous. (*Id*., PageID # 181) After four attempts to extract cells, however, McClave and his pathologist were unable to confirm that the mass was not a GIST. (*Id*., PageID # 181–83) Dr. McClave therefore concluded that the mass had a "high clinical suspicion for GIST" and recommended a surgical evaluation for wedge resection in the event that the pathology results were "nondiagnostic" (i.e., inconclusive).[2] (D.N. 41-2, PageID # 398) A pathology report indeed returned with a nondiagnostic finding. (*Id*., PageID # 402)

---

[1] The purpose of an EUS is to look through the wall layers of a mass to gain a better understanding of its nature. (D.N. 38-4, PageID # 165–66)
[2] A wedge resection in this instance is essentially a surgical procedure to remove the mass. (*Id*., PageID # 185)

On January 17, 2012, Johnson met with Dr. Edwin Gaar, who at the time served as chief of surgery at the VAMC. (D.N. 41-7, PageID # 575) Prior to the meeting, Dr. Gaar reviewed Johnson's medical records, including the pathology report from Johnson's visit to the University of Louisville Hospital.[3] (*Id.*) Dr. Gaar then discussed with Johnson the risks and benefits of removing the mass via surgery, and Johnson agreed to proceed with the operation.[4] (*Id.*) Thereafter, Johnson met with Dr. Gaar and resident physician Kristina Spate on a number of occasions. On February 21, 2012, Dr. Spate recommended that Johnson receive an antrectomy, possible vagotomy, and a reconstruction of his stomach.[5] (D.N. 38-2, PageID # 135)

Prior to the surgery, Johnson signed a medical-consent form, which detailed the specific procedures he would undergo. (D.N. 38-6, PageID # 344–51) The form explained that doctors would remove a section of Johnson's stomach, cut several nerves to and alter drainage of his stomach, and surgically connect the remaining portion of his stomach to his small intestine. (*Id.*, PageID # 345) The form also detailed potential side effects, including chronic diarrhea, the need for dietary supplements, the need to alter eating habits, and "dumping syndrome."[6] (*Id.*, PageID # 346) Dr. Glen Franklin, program director at the VAMC, reviewed Johnson's medical records and agreed with Dr. Gaar and Dr. Spate's recommendations. (D.N. 38-2, PageID # 128) Dr. Franklin met with Johnson and discussed the risks and benefits of the planned procedures. (*Id.*, PageID # 128–29) On March 2, 2012, Dr. Jerome Byam performed a wedge resection,

---

[3] Johnson takes issue with the fact that the VAMC allegedly scheduled his surgery prior to reviewing the pathology report. (*See* D.N. 41-7, PageID # 577) Even if true, that fact is irrelevant. Dr. Gaar reviewed the pathology report prior to his meeting with Johnson (*id.*, PageID # 575), and attending surgeon Dr. Glen Franklin confirmed that the pathology results were nondiagnostic prior to performing Johnson's surgery (D.N. 38-2, PageID # 128).
[4] Johnson alleges that Dr. Gaar did not mention the full scope of the surgery with him at this meeting. (D.N. 41-8, PageID # 613) That issue is addressed below.
[5] An antrectomy is a resection of a part of the stomach. (D.N. 38-5, PageID # 295)
[6] Dumping syndrome "occurs when the stomach's contents are delivered too quickly to the small intestine causing stomach pain, diarrhea, bloating, and dizziness." (D.N. 38-6, PageID # 346)

pyloroplasty, and vagotomy on Johnson, with Dr. Franklin attending.[7] (*Id.*, PageID # 130–32) Following the surgery, a pathology report demonstrated that the mass was not in fact a cancerous GIST. However, the report indicated the presence of *H. pylori* and signs of chronic active gastritis in Johnson's system.[8] (*Id.*, PageID # 111–12) A post-operation note also indicated that the doctors had trouble removing Johnson's drainage tube. (*Id.*, PageID # 120)

On September 9, 2015, Johnson brought this action against the United States pursuant to the Federal Tort Claims Act (FTCA). (D.N. 1) In his complaint, Johnson alleges that the VAMC's actions constituted negligent medical care and resulted in serious bodily injury. (*Id.*, PageID # 2) Although not detailed in his complaint, Johnson also appears to assert an informed-consent claim under Kentucky law. (*See* D.N. 41-8, PageID # 623) The United States now seeks summary judgment. (D.N. 38)

## II.    Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the movant "bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see generally Premo v. United States*, 599 F.3d 540, 544 (6th Cir. 2010) (discussing the summary judgment standard in the context of an FTCA

---

[7] The principal purpose of a vagotomy is to diminish the amount of acid in the stomach and to aid in the healing of ulcers. (D.N. 38-5, PageID # 312) When a vagotomy is performed, the stomach loses its ability to empty. (*Id.*, PageID # 313–14) A pyloroplasty is therefore performed to create a large hole for the stomach to drain out. (*Id.*)
[8] *H. pylori* is a bacterial infection associated with ulcers. (D.N. 38-5, PageID # 319)

action). The movant may do so by merely showing that the nonmoving party lacks evidence to support an essential element of its case for which it has the burden of proof. *See id.*

If the moving party satisfies this burden, the nonmoving party must point to specific facts in the record demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). To survive a motion for summary judgment, the nonmoving party must establish a genuine issue of material fact with respect to each element of each of his claims. *Celotex Corp.*, 477 U.S. at 323 (noting that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial"). The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient; instead, the nonmoving party must present evidence upon which the jury could reasonably find for him. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996) (citing *Anderson*, 477 U.S. at 252). This "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). For purposes of a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014).

### III. Discussion

"The liability of the United States in actions under the [FTCA] is governed by the law of the place where the alleged tort occurred." *Ward v. United States*, 838 F.2d 182, 184 (6th Cir. 1988). Here, the alleged tort occurred in Louisville, Kentucky. (*See* D.N. 1) The Court will therefore apply Kentucky law.

In Kentucky, "a plaintiff alleging medical malpractice is generally required to put forth expert testimony to establish the applicable medical standard of care and to show that the defendant medical provider failed to conform to that standard of care." *West v. Huxol*, 135 F. Supp. 3d 590, 599 (W.D. Ky. 2015) (citing *Blankenship v. Collier*, 302 S.W.3d 665, 670–71 (Ky. 2010)). "In cases involving professions requiring special skill and expertise, the standard of care is usually measured by the conduct customary in the profession under the circumstances." *Slone v. Lincoln Cty., Ky.*, 242 F. Supp. 3d 579, 596 (E.D. Ky. 2017) (citing *Hyman & Armstrong, P.S.C. v. Gunderson*, 279 S.W.3d 93, 113 (Ky. 2008)). To establish the applicable standard of care, the expert should "explain what a reasonable health-care provider would have done during the interactions between" the patient and the physicians. *Moore v. United States*, No. 6:14-CV-114-DLB-HAI, 2016 WL 5339361, at *4 (E.D. Ky. Aug. 11, 2016), *report and recommendation adopted*, 2017 WL 1003248 (E.D. Ky. Mar. 15, 2017). However, "no expert testimony is needed in situations where the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts." *Vance ex rel. Hammons v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996) (internal quotations omitted) (quoting *Perkins v. Hausladen*, 828 S.W.2d 652, 655–56 (Ky. 1992)).

**A. The United States' Expert**

In support of its position, the United States offers the report of Dr. Charles Woodall, a board certified surgeon from Ozark, Missouri.[9] (*See* D.N. 38-8) In his report, Dr. Woodall explains:

---

[9] Johnson misstates the filings in this case and suggests that Dr. McClave—the University of Louisville doctor who performed the EUS on Johnson—is the United States' retained expert. (*See* D.N. 41-8, PageID # 617–19) Although the government presents deposition testimony from Dr. McClave, it is clear from the record that the United States' retained expert in this matter is Dr. Charles Woodall. (*See* D.N. 38-8; *cf.* D.N. 38-4)

> Mr. Johnson was thought to have a malignant tumor and the only way to definitively rule this out was to perform an excisional biopsy. Once that biopsy had been performed, the visceral defect created in the gastric wall required closure, and in this location that necessitated a pyloroplasty. Vagotomy is performed when this is done because it reduces acid secretion.

(*Id.*, PageID # 364) Dr. Woodall also states that while he typically would have performed CT imaging prior to the type of surgery Johnson received, he finds that it would not have added anything to the medical record in Johnson's case. (*Id.*, PageID # 362–63) In conclusion, Dr. Woodall states: "I find no evidence of deviation from the standard of care and I have formed my opinion based on a very high level of medical certainty." (*Id.*, PageID # 363)

**B. Johnson's Expert**

In support of his position, Johnson retained Dr. Peter Sherer, an internist from Wheaton, Maryland, who specializes in hematology and oncology. (*See* D.N. 41-5) In his report, Dr. Sherer concludes that based on the medical evidence:

> The performance of a vagotomy and pyloroplasty *is very unusual* as the treatment for peptic ulcer disease now that we have more effective medications. The vagotomy, *I do not believe*, was indicated . . . . The pyloroplasty would not have been required had they not done the antrectomy. What should have been done if [Johnson] had surgery at all, would be to try to do an open excisional biopsy of the suspicious area, and if indeed a malignancy were found, then to proceed further. This was not the case, and indeed he did not have a malignancy and *I do not believe* that he needed the extent of surgery that he had . . . . *I think* they could have taken their time and found out more about the lesion in the stomach before proceeding with this surgery.

(*Id.*, PageID # 409 (emphasis added)) After reviewing the depositions of Dr. McClave and Dr. Gaar, Dr. Sherer submitted a follow-up letter, which states:

> The European Society for Medical Oncology (ESMO) actually recommends that tumors smaller than 2cm should just be followed periodically by endoscopy as not all of them progress[] . . . . *While I am not a surgeon*, I believe Mr. Johnson's surgery was excessive and I stand by my opinions set forth in my [previous] letter.

(*Id.*, PageID # 410 (emphasis added))

7

**C. Medical-Negligence Claim**

*1. Sufficiency of Expert Opinion*

In its motion for summary judgment, the United States contends that Johnson's proffered expert fails to establish the applicable standard of care. (*See* D.N. 38-1) Specifically, the United States maintains that a "fair reading" of Dr. Sherer's report fails to inform "that the choice of treatment offered by the VAMC deviated from a recognized standard of care in the medical profession." (*Id.*, PageID # 107)

As mentioned above, to proceed with his medical-negligence claim, Johnson must "put forth expert testimony to establish the applicable medical standard of care and to show that the defendant medical provider failed to conform to that standard of care." *West*, 135 F. Supp. 3d at 599. An expert's failure to adequately establish the applicable standard of care is grounds for dismissal of the plaintiff's medical-negligence claim. *See Moore v. United States Dep't of Agric.*, No. 17–5363, 2018 WL 1612299, at *3 (6th Cir. Jan. 31, 2018) (applying Kentucky law and finding that the plaintiff's proffered "expert testimony failed to establish that a medical provider failed to adhere to the standard of care of a reasonably competent practitioner in the same medical field, proximately causing the plaintiff's injury"); *see also Bryant v. King's Daughter Med. Ctr.*, No. 11–36–EBA, 2013 WL 186927, at *10 (E.D. Ky. Jan. 17, 2013) ("Dr. Faresi's deposition, the only expert testimony upon which Plaintiffs rely to establish [the] standard [of care], says nothing as to how a reasonably competent nurse should care for a patient in Mrs. Bryant's situation.").[10] Courts have found that an expert opinion inadequately explains

---

[10] Although not binding authority, several unpublished decisions from the Kentucky Court of Appeals have reached the same conclusion. *See, e.g.*, *Hitch v. St. Elizabeth Med. Ctr., Inc.*, No. 2014-CA-1361-MR, 2016 WL 1557734, at *2 (Ky. Ct. App. Apr. 15, 2016) (granting summary

the standard of care where the opinion is "couched in subjective terms." *See EQT Prod. Co. v. Vorys, Sater, Seymour & Pease, LLP*, No. 15-146-DLB-EBA, 2018 WL 1996797, at *18–20 (E.D. Ky. Apr. 27, 2018).

Here, Johnson's retained expert Dr. Sherer fails to adequately establish the applicable standard of care. First, Dr. Sherer explains that the vagotomy and pyloroplasty were "unusual treatments" for peptic ulcer disease, and that "[he does] not believe" that either procedure was necessary. (D.N. 41-5, PageID # 409) Dr. Sherer's subjective beliefs fail to state an objective standard of care, however. *See EQT Prod. Co.*, 2018 WL 1996797 at *18–20. And merely stating that a procedure is "unusual" fails to "*affirmatively* state[] breach of the applicable standard of care." *Byrd*, 2003 WL 22025864 at *2 (emphasis added). Second, although Dr. Sherer states that a different surgical procedure "should have been done," he immediately qualifies that statement by explaining, "*I do not believe* that he needed the extent of surgery that he had." (D.N. 41-5, PageID # 409 (emphasis added)) Again, an expert opinion inadequately explains the standard of care where the opinion is "couched in subjective terms" (i.e., when an expert merely explains what he personally would have done differently). *See EQT Prod. Co.*, 2018 WL 1996797 at *18–20; *Stacey v. Williams*, 69 S.W.2d 697, 704 (Ky. 1934) ("[I]t is not enough that there has been a less degree of care than *some other medical man might have shown*, or less than even he himself might have bestowed, but there must be a want of ordinary and

---

judgment where the expert "made no statement to indicate what the standard of care is"); *Tackett v. Appalachian Reg'l Healthcare, Inc.*, No. 2007-CA-720-MR, 2008 WL 2779528, at *2–4 (Ky. Ct. App. July 18, 2008) (granting summary judgment where the plaintiff's expert "failed to produce evidence as to the medical standard of care at issue"); *Byrd v. Lopez*, No. 2002-CA-001368-MR, 2003 WL 22025864, at *2 (Ky. Ct. App. Aug. 29, 2003) ("The trial court correctly found that this claim was insufficient to proceed to trial in the absence of an expert opinion *affirmatively* stating breach of the applicable standard of care." (emphasis added)).

reasonable care, leading to a bad result." (emphasis added)).[11]   In any event, Dr. Sherer's conclusory remark does not establish what a reasonably competent surgeon would have done under like circumstances.  The opinion is further discounted because Dr. Sherer is "not a surgeon."  (D.N. 41-5, PageID # 410)  *See Bryant*, 2013 WL 186927 at *10 ("Dr. Faresi's deposition . . . says nothing as to how a reasonably competent nurse should care for a patient in [the plaintiff's] situation. In fact, Dr. Faresi explicitly declared, 'I don't know the nurse's responsibilities.  I'm a physician.'").  Lastly, Dr. Sherer's citation to the European Society of Medical Oncology—although more objective than his other pronouncements—is nevertheless inadequate.  (*Id*., PageID # 410)  Dr. Sherer fails to state that the ESMO's recommendation is "the conduct *customary* in the profession *under the circumstances*."  *Slone*, 242 at 596 (emphasis added).  Because Dr. Sherer inadequately establishes the applicable standard of care, summary judgment in favor of the United States is warranted.  *Moore*, 2018 WL 1612299 at *3.

*2. Absence of Material Question of Fact as to the Surgery Issue*

Even if Dr. Sherer had adequately explained the applicable standard of care, summary judgment would be appropriate as to Johnson's claim concerning the necessity of his surgery given the overwhelming evidence in the record to indicate that Johnson's surgery was warranted. Every treating doctor who testified in this matter explained that the VAMC's decision to perform the procedures at issue was consistent with the applicable standard of care.  Dr. McClave concluded that the wedge resection was clinically appropriate given the lack of determinative medical information regarding Johnson's mass.  (D.N. 38-4, PageID # 187)  And because Johnson had previously been hospitalized due to "acute blood loss secondary to [a] duodenal

---

[11] By way of comparison, the United States' retained expert Dr. Woodall uses objective language: "[Johnson] underwent the *appropriate, definitive procedure* to treat both of his problems . . . . In my review of the available records, I find no evidence of deviation from the standard of care." (D.N. 38-8, PageID # 363 (emphasis added))

ulcer," the doctors had ample authority to conclude that a vagotomy was appropriate. (D.N. 41-7, PageID # 575) Dr. Gaar testified that while a vagotomy is no longer commonly used, the medical community still performs the procedure where previous medical treatment has failed to cure a patient's recurring acid reflux. (D.N. 38-5, PageID # 313) Indeed, Dr. Gaar explained that given the presence of *H. pylori* in Johnson's system, which is a risk factor for ulcers, a vagotomy was appropriate.[12] (*Id.*, PageID # 319) He also testified that a pyloroplasty was necessary since the vagotomy was performed. (*Id.*, PageID # 313) Finally, in reviewing Johnson's case, Dr. David Coffey—who issued a medical opinion for the VAMC regarding a disability-benefits claim filed by Johnson following the surgery—determined that it was less likely than not that Johnson's alleged ailments "resulted from carelessness, negligence, lack of skill, or similar incidence of fault on the part of the [VAMC]." (D.N. 41-7, PageID # 581) Dr. Coffey also determined that it was more likely than not that Johnson's ailments "resulted from an event that could not have reasonably been foreseen by a reasonable healthcare provider." (*Id.*)

In rebuttal, Johnson does not dispute that he had previously been hospitalized in connection with a bleeding ulcer, that previous medications had failed to reduce his acid reflux, or that *H. pylori* was present in his system. (*See* D.N. 41-8) Nor does Johnson challenge Dr. Coffey's findings. (*Id.*) The Court therefore finds that no genuine dispute of material fact exists regarding whether the medical professionals at issue in this matter deviated from the applicable

---

[12] Johnson claims that no ulcer was identified during the preoperative EGD and that because he did not have a "history of duodenal ulcers," the vagotomy was unnecessary. (D.N. 41-8, PageID # 621–22) Neither contention is persuasive, however. First, even if no ulcer was identified during the preoperative EGD, Johnson does not refute that he had previously suffered from a bleeding ulcer. (*Id.*) Second, following the surgery, the pathology report demonstrated signs of chronic active gastritis and the presence of *H. pylori* in Johnson's system, the latter of which is associated with recurring stomach ulcers. (D.N. 38-2, PageID # 111–12)

11

standard of care in deciding to perform the operations on Johnson. Summary judgment is therefore warranted as to Jackson's claim concerning the necessity of his surgery.

*3. Drainage-Tube Issue*

Johnson presents one final argument in support of his medical-negligence claim. As mentioned above, medical records reflect that doctors had difficulty removing Johnson's drainage tube. (D.N. 38-2, PageID # 120) Johnson contends that the medical documents in this matter downplay the extent of the doctors' negligence in that removal. According to Johnson's deposition testimony, Dr. Byam sewed the drainage tube into Johnson's surgical incision and thereafter "ripped out" the tube and his sutures, causing him great pain. (D.N. 41-6, PageID # 515–520)

For purposes of summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. *Loyd*, 766 F.3d at 588. Moreover, because the medical records do not refute Johnson's account of the incident—indeed, they merely explain in general terms that the doctors had "difficulty" removing the drainage tube—the Court will view the records consistent with Johnson's account. (*See* D.N. 38-2, PageID # 120) In doing so, the Court concludes that the drainage-tube incident presents a material question of fact regarding whether the doctors negligently removed the drainage tube thereby causing Johnson injury.

Additionally, under Johnson's version of the events, no expert is needed to establish breach of the standard of care. As explained above, "no expert testimony is needed in situations where the common knowledge or experience of laymen is extensive enough to recognize or to infer negligence from the facts." *Vance ex rel. Hammons*, 90 F.3d at 1148 (internal quotations omitted) (quoting *Perkins*, 828 S.W.2d at 655–56). The Court concludes that if the events

occurred as Johnson alleges, a layman would be able to infer negligence from the facts.[13] Summary judgment is therefore warranted only if the United States has presented testimony that even under Johnson's version of events, no negligence occurred. *Celotex Corp.*, 477 U.S. at 323. The United States' proffered expert does not make that contention. (D.N. 38-8) Nor does the United States even address the drainage-tube issue in its reply brief. (*See* D.N. 45)

Accordingly, from the record before it, the Court finds that summary judgment as to Johnson's drainage-tube claim is unwarranted.

**D. Informed Consent**

The United States also maintains that Johnson's informed-consent claim fails because his expert Dr. Sherer fails to offer an opinion regarding consent. (D.N. 38-1, PageID # 108–09) Recent caselaw suggests, however, that an expert opinion may not be necessary in every informed-consent case. *See Argotte v. Harrington*, 521 S.W.3d 550, 556 (Ky. 2017). Nevertheless, regardless of the necessity of an expert opinion, Johnson's informed-consent claim is refuted by overwhelming evidence in the record such that no jury could reasonably find for him. *See Hartsel*, 87 F.3d at 799. The medical evidence indicates that Dr. Gaar and Dr. Spate informed Johnson that he would receive an antrectomy and possible vagotomy. (*See* D.N. 38-2, PageID # 133, 135) Additionally, the consent form that Johnson signed prior to surgery

---

[13] The Eastern District of Kentucky has determined that "laymen do not commonly possess the knowledge about the expertise involved in the removal of draining tubes or the expertise involved in preventing fluid accumulation after a surgery." *Bryant*, 2013 WL 186927 at *10. In *Bryant*, however, the plaintiff alleged that the doctors at issue had removed one of her drainage tubes too early, causing an accumulation of fluid in her other drainage tube and eventually resulting in an infection at her incision site. *Id.* at *5. The reasonable time to remove a drainage tube and the procedures needed to prevent fluid accumulation are clearly medical topics that a layman would not necessarily understand. Here, Johnson alleges much more directly that the drainage tube was negligently sewn into his incision and then subsequently "ripped out," causing him pain. (*See* D.N. 41-6) A layman can infer negligence from those facts. *Cf. Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. Ct. App. 2006) (recognizing that Kentucky courts generally do not require expert testimony "where the surgeon leaves a foreign object in the body").

indicated that he would receive a vagotomy/pyloroplasty, gastrectomy subtotal – laparoscopic, and gastrectomy subtotal/vagotomy. (D.N. 38-6, PageID # 344) And curiously, it seems that Johnson concedes this point in his response brief, where he states: "The records reveal [Johnson's] signature on the consent forms and . . . Dr. Sherer did not find error regarding informed consent." (D.N. 41-8, PageID # 623) The Court therefore finds that Johnson's contention that none of the procedures "had been discussed or explained to [him]" is adequately refuted by the undisputed record. (*See* D.N. 41-8, PageID # 615)

### IV. Conclusion

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1) The United States' motion for summary judgment (D.N. 38) is **GRANTED in part and DENIED in part**. Johnson's claims concerning the necessity of his surgery and his alleged consent to undergo the surgery are **DISMISSED** with prejudice. Johnson may proceed with his claim concerning the removal of his drainage tube.

(2) Pursuant to General Order No. 2018-08, Exhibit D, this matter is now assigned to Magistrate Judge Colin H. Lindsay, who may conduct a status conference or other proceeding to develop a final schedule for this matter.

July 30, 2018

**David J. Hale, Judge**
**United States District Court**